# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| KAREN J., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:23CV388 |
| | ) | |
| MARTIN J. O'MALLEY, | ) | |
| Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant.[1] | ) | |

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Karen J., brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Commissioner of Social Security (the "Commissioner"), denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). (Docket Entry 1.) The Commissioner has filed the certified administrative record (Docket Entry 3 (cited herein as "Tr. __")), and both parties have submitted dispositive briefs in accordance with Rule 5 of the Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g) (Docket Entry 7 (Plaintiff's Brief); Docket Entry 10 (Commissioner's Brief); Docket Entry 12 (Plaintiff's Reply)). For the reasons that follow, the Court should enter judgment for the Commissioner.

---

[1] On December 20, 2023, President Joseph R. Biden, Jr., appointed Martin J. O'Malley as Commissioner of the Social Security Administration. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin J. O'Malley should substitute for Kilolo Kijakazi as Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

# I. PROCEDURAL HISTORY

Plaintiff applied for DIB (Tr. 232-38), alleging a disability onset date of July 25, 2016 (see Tr. 232, 235). Upon denial of that application initially (Tr. 109-19, 130-34) and on reconsideration (Tr. 120-29, 142-46), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 147-49). Plaintiff, her attorney, and a vocational expert ("VE") attended the hearing. (Tr. 45-108.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 15-44.) The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6, 228-30, 1013-23), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that decision, the ALJ made the following findings later adopted by the Commissioner:

> 1. [Plaintiff] met the insured status requirements of the . . . Act through March 31, 2022.
>
> 2. [Plaintiff] did not engage in substantial gainful activity during the period from her alleged onset date of July 25, 2016 through her date last insured of March 31, 2022.
>
> . . .
>
> 3. Through the date last insured, [Plaintiff] had the following severe impairments: interstitial cystitis, gastritis, irritable bowel syndrome, hypertension, carpal tunnel syndrome, Raynaud's phenomenon, inflammatory arthritis, post-traumatic stress disorder (PTSD), attention deficit hyperactivity disorder (ADHD), depressive disorder, and anxiety disorder.
>
> . . .

2

4.   Through the date last insured, [Plaintiff] did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5.   . . . [T]hrough the date last insured, [Plaintiff] had the residual functional capacity to perform medium work . . . except that she could perform handling frequently with the left hand and frequently with the right hand; perform fingering frequently with the left hand and frequently with the right hand; frequently climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance, stoop, kneel, crouch, and crawl; could never work at unprotected heights or around moving mechanical parts; could understand, remember, and carry out simple instructions but not at a production-rate pace (e.g., no assembly line work); was limited to making simple work-related decisions; could have no more than occasional changes in the routine work setting; and could have no more than occasional interaction with the public, coworkers, and supervisors.

. . .

6.   Through the date last insured, [Plaintiff] was unable to perform any past relevant work.

. . .

10.  Through the date last insured, considering [Plaintiff]'s age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that [she] could have performed.

. . .

11.  [Plaintiff] was not under a disability, as defined in the . . . Act, at any time from July 25, 2016, the alleged onset date, through March 31, 2022, the date last insured.

(Tr.  21-36  (bold  font  and  internal  parenthetical  citations omitted).)

3

## II.  DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits."  Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006).  However, "the scope of . . . review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981).  Plaintiff has not established entitlement to relief under the extremely limited review standard.

### A.  Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).  Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard."  Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)).  "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation marks omitted).  "If there is evidence to justify a refusal to direct a verdict were the

4

case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id.

5

(quoting 42 U.S.C. § 423(d)(1)(A)).[2] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . promulgated . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id. (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity [('RFC')] to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[3] A finding adverse to the claimant at any of several points in the SEP forecloses an award

---

[2] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

[3] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [government] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

6

and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's [RFC]." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

7

both [the RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[5]

## B. Assignments of Error

Plaintiff argues that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "[t]he Appeals Council erred in failing to consider evidence submitted during the administrative review process" (Docket Entry 7 at 8 (standard capitalization applied) (bold font and block formatting omitted); see also Docket Entry 12 at 1-3);

2) "[t]he ALJ erred in relying on mischaracterizations of [Plaintiff's] activities in finding that she has an RFC for medium work" (Docket Entry 7 at 9 (standard capitalization applied) (bold font and block formatting omitted); see also Docket Entry 12 at 3-4); and

3) "[t]he ALJ's RFC assessment is flawed and not supported by substantial evidence" (Docket Entry 7 at 13 (standard

---

[5] A claimant thus can qualify as disabled via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

8

capitalization applied) (bold font and block formatting omitted); see also Docket Entry 12 at 3-6).

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (Docket Entry 10 at 3-23.)

### 1. New Evidence Submitted to Appeals Council

In Plaintiff's first issue on review, she asserts that "[t]he Appeals Council erred in failing to consider evidence submitted during the administrative review process." (Docket Entry 7 at 8 (standard capitalization applied) (bold font and block formatting omitted); see also Docket Entry 12 at 1-3.) More specifically, Plaintiff maintains that she "submitted two pieces of additional evidence along with the [r]equest for [r]eview of the [h]earing [d]ecision" (Docket Entry 7 at 8 (referencing Docket Entry 7-1 at 1-2)), a "To Whom It May Concern" letter from Dr. Charles D. Bond dated August 22, 2022 ("Bond Letter") (see id. (citing Tr. 13)), and Plaintiff's "Declaration" dated August 26, 2022 (id. (citing Docket Entry 7-1 at 3-4)), and that, although "[t]he Appeals Council considered the [Bond Letter, it] failed to review [Plaintiff's Declaration] . . . and it did not include [Plaintiff's Declaration] in the administrative record" (id.; see also id. at 8 (setting forth language from Appeals Council's denial of review that mentioned only Bond Letter (quoting Tr. 2))). Plaintiff points out that "SSA regulations require that the Appeals Council evaluate all evidence that it receives during the administrative

review process and include that evidence in the certified administrative record." (Id. at 7 (emphasis in original) (citing 20 C.F.R. § 404.976).) According to Plaintiff, "[t]he Appeals Council's violation of 20 [C.F.R. §] 404.976 was harmful," because "the ALJ substantially based his denial on misapprehensions and mischaracterizations of [Plaintiff's] activity level," and Plaintiff['s Declaration] "addressed and rebutted the essential distortions on which the ALJ relied to deny [Plaintiff's] claim." (Id. at 8.) For the reasons explained in more detail below, Plaintiff's contentions ultimately lack merit.

The applicable regulation provides that the Appeals Council "will evaluate all additional evidence it receives, [and] will only mark as an exhibit and make a part of the official record additional evidence it determines meets the requirements of [20 C.F.R.] § 404.970(a)(5) and (b)," but that the Appeals Council "will include in th[e certified administrative] record [in federal district court] all additional evidence the Appeals Council received during the administrative review process, including additional evidence that the Appeals Council received but did not exhibit or make part of the official record." 20 C.F.R. § 404.976(a) (emphasis added); see also Hearings, Appeals, and Litigation Law Manual ("HALLEX"), § I-3-5-20C.3 ("Evaluation of

Additional Evidence") (Dec. 16, 2020).[6] Moreover, although, as a general matter, this Court lacks the authority to scrutinize the Appeals Council's decision to deny Plaintiff's request for review, see Matthews v. Apfel, 239 F.3d 589, 594 (3d Cir. 2001) ("No statutory authority (the source of the district court's review) authorizes the court to review the Appeals Council['s] decision to deny review."); Eads v. Secretary of Health & Human Servs., 983 F.2d 815, 817 (7th Cir. 1993) ("[W]hen the [Appeals] Council has refused to review the case[,] . . . the decision reviewed in the [federal district] courts is the decision of the [ALJ]." (emphasis added)), some courts have held that federal district courts may review de novo legal errors by the Appeals Council in applying its own regulations, see Getch v. Astrue, 539 F.3d 473, 483 (7th Cir. 2008) (noting that the court would "evaluate de novo whether the Appeals Council made an error of law in applying [20 C.F.R.

_____

[6] The applicable regulations provide, in pertinent part, as follows:

(a) The Appeals Council will review a case if—

. . .

> (5) Subject to paragraph (b) of this section, the Appeals Council receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision.

(b) The Appeals Council will only consider additional evidence under paragraph (a)(5) of this section if [the claimant] show[s] good cause for not informing [the ALJ] about or submitting the evidence as described in § 404.935 [which requires claimants to submit evidence at least five days prior to the ALJ hearing].

20 C.F.R. § 404.970 (emphasis added).

§ 404.970(b)]"); Mills v. Apfel, 244 F.3d 1, 5 (1st Cir. 2001) ("holding that an Appeals Council refusal to review the ALJ may be reviewable where it gives an egregiously mistaken ground for this action"); Box v. Shalala, 52 F.3d 168, 171-72 (8th Cir. 1995) ("Whether the evidence is new, material and related to the relevant period is a question of law reviewed de novo."); Ledbetter v. Astrue, No. 8:10CV195, 2011 WL 1335840, at *13 n.7 (D.S.C. Apr. 7, 2011) ("[G]enerally, the [Appeals] Council's decision whether to review is discretionary and unreviewable. But review of the [Appeals] Council's decision is allowed in the presence of legal error." (internal citations omitted) (relying on, inter alia, Perkins v. Chater, 107 F.3d 1290, 1294 (7th Cir. 1997), Mills, and Box).

Here, Plaintiff's request for review with the Appeals Council reflects that she "[a]ttached [f]iles" to her request (Tr. 229; see also Docket Entry 7-1 at 1-2 (identifying "[a]ttached [f]iles" as "Bond RFC followup.pdf" and "Declaration Karen Jones SSDI Appeal 2022_08_26.pdf")), and Plaintiff's counsel expressly referenced both documents in her arguments submitted to the Appeals Council in support of Plaintiff's request for review (see Tr. 1016 & nn.2, 3). The Appeals Council's notice of its decision denying review acknowledged that Plaintiff "submitted a one-page statement from C. Bond, M.D. dated August 22, 2022," but "f[ound that the Bond Letter] d[id] not show a reasonable probability that it would

12

change the outcome of the decision" and, thus, "did not exhibit th[e Bond Letter]" (Tr. 2), and included it in the certified administrative record before this Court (Tr. 12-14). Significantly, the Appeals Council's notice did <u>not</u> acknowledge in any manner Plaintiff's submission of her Declaration (<u>see</u> Tr. 1-6), and that document does <u>not</u> appear in the administrative record before the Court.

The Appeals Council's apparent failures to 1) evaluate Plaintiff's Declaration in any manner, and 2) include it in the administrative record, violate 20 C.F.R. § 404.976(b). <u>See</u> <u>Smith v. Berryhill</u>, No. 1:18CV37, 2019 WL 1549036, at *25 (D.S.C. Mar. 6, 2019) (unpublished) ("If [the p]laintiff properly submitted this additional evidence for review to the Appeals Council, review of HALLEX supports [that new evidence from a treating physician] should have been included in the administrative record certified to th[e] court and failure to do so appears to be an error. . . ." (internal citations omitted) (citing, <u>inter alia</u>, HALLEX I-3-5-20)), <u>recommendation adopted</u>, 2019 WL 1533171 (D.S.C. Apr. 9, 2019) (unpublished). A finding of procedural errors by the Appeals Council, however, does not end the Court's inquiry, as the Court should consider whether those errors prejudiced Plaintiff. <u>See generally</u> <u>Fisher v. Bowen</u>, 869 F.2d 1055, 1057 (7th Cir. 1989) (observing that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion

13

unless there is reason to believe that the remand might lead to a different result).

Members of this Court recently considered similar failures by the Appeals Council to acknowledge new evidence submitted by a claimant and include it in the administrative transcript, and subjected those procedural errors by the Appeals Council to harmlessness analysis:

> . . . [The p]laintiff asserts that the Appeals Council erred by "simply ignor[ing]" evidence she submitted to it. It does appear that [the p]laintiff's counsel faxed this evidence — a one-paragraph written statement by [her treating psychiatrist] post-dating the ALJ's unfavorable decision and gathered at counsel's request — to the Appeals Council. Yet, it was not exhibited to, or acknowledged by, the Appeals Council's denial of [the p]laintiff's request for review, nor was it included in the administrative record. It is thus unclear whether the Appeals Council looked at or assessed [the treating psychiatrist]'s post-decision statement. The Court will therefore presume that the Appeals Council ignored [the treating psychiatrist]'s statement as [the p]laintiff alleges. Nevertheless, errors such as the one alleged here do not warrant a per se reversal. Instead, the proper course is to consider whether the error was harmless.

Montoya v. Kijakazi, No. 1:20CV1157, 2022 WL 562945, at *8 (M.D.N.C. Jan. 11, 2022) (unpublished) (Webster, M.J.) (emphasis added) (internal parenthetical citations omitted), recommendation adopted, 2022 WL 561533 (M.D.N.C. Feb. 24, 2022) (unpublished) (Biggs, J.). Accordingly, the Court should consider whether the Appeals Council's procedural errors with respect to Plaintiff's Declaration qualify as harmless under the circumstances of this case.

14

The Commissioner recognizes that the Appeals Council "did not address Plaintiff's [D]eclaration" (Docket Entry 10 at 6 n.2), but contends that "Plaintiff has not satisfied the good cause requirement" in Section 404.970(b), and "readily admitted that the evidence was being 'submitted as rebuttal evidence'" (id. at 6 (quoting Tr. 1016)).  In Plaintiff's Reply, she asserts that the Commissioner's good cause argument "should [] be disregarded as an inappropriate *post hoc* rationalization," because "[t]he Appeals Council made no finding that it was rejecting the evidence because Plaintiff failed to show good cause for not submitting the evidence earlier," but "found that [the Bond Letter] would not change the outcome."  (Docket Entry 12 at 2 (citing Tr. 2).)  Plaintiff additionally maintains that, because her Declaration "constitutes rebuttal evidence[,] . . . it meets the [good cause] requirements of [Section] 404.970(b)."  (Id. (citing 81 Fed. Reg. 90987, "Ensuring Program Uniformity at the Hearing and Appeals Council Levels of the Administrative Review Process," (Dec. 16, 2016)).)

In both Montoya and Smith, the court found that the Appeals Council's procedural errors in failing to acknowledge new evidence submitted by the plaintiff and to include that new evidence in the administrative transcript qualified as harmless, because the plaintiff could not show good cause for her failure to submit the new evidence while her case remained pending before the ALJ.  See Montoya, 2022 WL 562945, at *9-10 ("[A]ny failure by the Appeals

15

Council to look at a statement it was prohibited from even considering was necessarily harmless. . . . [The p]laintiff has not provided good cause for failing to submit [the treating psychiatrist]'s statement to the ALJ prior to the administrative hearing. The explanation [the p]laintiff provides in her reply brief — that [the treating psychiatrist] could not correct the ALJ's 'misinterpretation' of the evidence prior to the issuance of the decision — does not provide good cause. . . . Were the Court to conclude otherwise, the good cause requirement would be rendered a nullity." (internal citation omitted)); Smith, 2019 WL 1549036, at *27 ("[The p]laintiff has not shown [the treating physician]'s statement, dated after the ALJ's decision, meets the good cause requirement under the amended regulation. [The plaintiff] has been represented by the same counsel since 2014, [the treating physician]'s statement is not the result of ongoing treatment, a new evaluation, or provided as rebuttal evidence to new evidence that the ALJ introduced at or after the hearing, but it is an attempt to clarify [the treating physician's] prior opinion based upon prior treatment notes dated years earlier that were already provided in the record.").

Both of those cases, however, involved factual circumstances that distinguish those cases from the instant case. In Montoya, the Appeals Council did not evaluate any new evidence submitted by the plaintiff and made no findings about the new evidence, thus

16

allowing the Court some latitude to determine in the first instance whether the plaintiff could demonstrate good cause for her late-submitted evidence. See Montoya, 2022 WL 562945, at *8-10. In Smith, the Appeals Council, like in the instant case, evaluated only part of the plaintiff's new evidence, see Smith, 2019 WL 1549036, at *11 & n.10, but expressly found that the plaintiff lacked good cause to submit it, see id. at *19, thus giving the court grounds to find that the plaintiff similarly lacked good cause to submit the new evidence not evaluated by the Appeals Council, see id. at *27. In contrast, the Appeals Council here evaluated only the Bond Letter, one of two pieces of Plaintiff's new evidence, but found that the Bond Letter did not raise reasonable probability of a different outcome and did not address good cause. (See Tr. 2.)[7] Given that the Appeals Council did not reject the Bond Letter (which Plaintiff also characterizes as "rebuttal evidence" (Docket Entry 12 at 2)) for lack of good cause, and failed to even acknowledge receipt of Plaintiff's Declaration (see id.), the Court should not find the Appeals Council's

---

[7] As recently noted in another case in this Court, in finding that new evidence did not raise a reasonable probability of a different outcome, the Appeals Council might have implicitly found that a claimant showed good cause for failing to submit the new evidence to the ALJ. See English v. Kijakazi, No. 1:22CV237, 2023 WL 3093446, at *10 (M.D.N.C. Apr. 26, 2023) (unpublished) (citing Vahey v. Saul, No. 18CV350, 2019 WL 3763436, at *6 (D. Haw. Aug. 9, 2019) (unpublished) (observing that, under the new [version of Section 404.970], the Appeals Council could only 'consider' evidence upon a showing of good cause and, given that Appeals Council's "denial letter [wa]s devoid of any good cause discussion," the possibility existed that the "Appeals Council implicitly found good cause")), recommendation adopted, 2023 WL 3983838 (M.D.N.C. June 13, 2023) (unpublished) (Osteen, J.).

procedural errors under Section 404.976 harmless on the basis of Plaintiff's alleged lack of good cause to submit the Declaration.[8]

The current state of the record, i.e., involving new evidence Plaintiff submitted to the Appeals Council but that the Appeals Council erroneously failed to evaluate or make a part of the record, presents the Court with a threshold issue of whether it should evaluate the harmlessness of the Appeals Council's errors regarding Plaintiff's Declaration under sentence four or sentence six of 42 U.S.C. § 405(g). Where the Appeals Council has considered and incorporated the new evidence into the record, the Court must address the new evidence under sentence four of Section 405(g). See Meyer v. Astrue, 662 F.3d 700, 704 (4th Cir. 2011) (noting that court would apply sentence four standard and "review

_____

[8] Although Plaintiff argues that her Declaration qualifies as rebuttal evidence which meets the good cause requirements of Section 404.970(b) (see Docket Entry 12 at 2 (citing 81 Fed. Reg. 90987)), that argument glosses over the fact that the cited authority clarifies that, "if an ALJ introduces new evidence at or after a hearing, the claimant could use the [good cause] exception [for unusual, unexpected, or unavoidable circumstances beyond her control] to submit rebuttal evidence," 81 Fed. Reg. 90987, 90991 (emphasis added). Plaintiff makes no argument that the ALJ "introduced new evidence at or after [her] hearing" (see Docket Entries 7, 12), and, therefore, her Declaration does not qualify as rebuttal evidence under that provision. See Cacciavillano v. Kijakazi, No. 4:21CV296, 2022 WL 2441559, at *7 (M.D. Pa. July 5, 2022) (unpublished) ("Although a claimant may submit 'rebuttal evidence' if an ALJ 'introduces new evidence at or after a hearing,' it is not contemplated that an ALJ's decision itself constitutes 'new evidence at or after a hearing' that a claimant may then 'rebut' with further 'evidence.'" (quoting 81 Fed. Reg. 90987-01, at 90991)); Garbisch v. Saul, No. 20CV572, 2021 WL 1248432, at *4 (W.D. Wis. Apr. 5, 2021) (unpublished) ("[The plaintiff] says that 'rebuttal evidence' includes any evidence that could be used to rebut a finding made by the ALJ in the decision. But if that were correct, it would mean that virtually any favorable evidence would satisfy the good-cause requirement. The reason for allowing a claimant to submit late 'rebuttal evidence' is that the claimant didn't have a previous opportunity to address new evidence discussed in the ALJ's decision, not to simply bolster the claimant's case." (internal citation and some internal quotation marks omitted) (quoting 81 Fed. Reg. 90987, 90991)).

18

the record as a whole including any new evidence that the Appeals Council specifically incorporated . . . into the administrative record" (internal quotation marks omitted)).  In contrast, if the Appeals Council declined to consider and to incorporate the new evidence into the record, the Court must evaluate the new evidence under sentence six of Section 405(g).  See Shalala v. Schaefer, 509 U.S. 292, 297 n.2 (1993) ("Sentence-six remands may be ordered . . . where new, material evidence is adduced that was for good cause not presented before the [SSA]." (citations omitted)); Farrell v. Astrue, 692 F.3d 767, 770 (7th Cir. 2012) ("Evidence that has been rejected by the Appeals Council cannot be considered [under sentence four] to reevaluate the ALJ's factual findings.").

Here, on the one hand, the Appeals Council (erroneously) neither acknowledged nor included in the record Plaintiff's Declaration (see Tr. 2), which would disfavor a sentence four approach.  On the other hand, the Appeals Council did not explicitly reject Plaintiff's Declaration and refuse to include it in the record (see id.), and Plaintiff did not submit her Declaration for the first time to this Court, which would suggest that sentence six should not apply, see Parker v. Colvin, No. 1:11CV746, 2014 WL 4386291, at *4 n.7 (M.D.N.C. Sept. 4, 2014) (unpublished) (Peake, M.J.) (declining to review harmlessness of Appeals Council's failure to acknowledge receipt of new evidence and include it in the record under sentence six of Section 405(g),

19

because "[the p]laintiff contend[ed] that the [new] evidence was actually submitted to the Appeals Council," and, thus, "th[e] case d[id] not involve new evidence submitted for the first time to the Court"), <u>recommendation adopted</u>, slip op. (M.D.N.C. Sept. 30, 2014) (Beaty, S.J.).

To resolve this quandary, the Court should follow the approach of a neighboring district court, which held that, "[b]ecause it was an error of law [for the Appeals Council] to not consider and exhibit [new] evidence, . . . it [is] proper to treat the [new evidence] as if it had been made a part of the record and consider it [under sentence four of Section 405(g)] on review," Sanders v. Kijakazi, No. 2:21CV35, 2021 WL 4755291, at *8, 10 (D.S.C. Sept. 23, 2021) (unpublished), recommendation adopted, 2021 WL 4754777 (D.S.C. Oct. 12, 2021) (unpublished); see also Wise v. Colvin, No. CIV.A. 6:13-2712, 2014 WL 7369514, at *7 (D.S.C. Dec. 29, 2014) (unpublished) ("The [c]ourt finds that the [Appeals Council] erred in not making this timely submission part of the record and consideration of the report by the [d]istrict [c]ourt [pursuant to sentence four of Section 405(g)] is, therefore, completely proper."). Proceeding under sentence four of Section 405(g), the Court "must review the record as a whole, including [Plaintiff's Declaration], in order to determine whether substantial evidence supports the [Commissioner]'s findings." Wilkins v. Secretary, Dep't of Health & Human Servs., 953 F.2d 93, 96 (4th Cir. 1991).

Case 1:23-cv-00388-CCE-LPA   Document 13   Filed 05/02/24   Page 20 of 59

For the following reasons, the Court should conclude that Plaintiff's Declaration does not render the ALJ's decision unsupported by substantial evidence, and, thus, that the Appeals Council's procedural errors in failing to evaluate the Declaration and include it in the record qualify as harmless.

On August 26, 2022, Plaintiff signed her Declaration under penalty of perjury and averred, in pertinent part, as follows:

> The [ALJ]'s decision denying my claim cites my ability to text and garden as evidence that I can use my hands for frequent handling and fingering and do repetitive and heavy lifting and carrying. I want to clarify any misperceptions regarding my ability to perform these and other activities.
>
> At the 6/8/22 hearing, the ALJ asked me if I use a cell phone. I tried to explain that it is best for me to keep my hands "open" to avoid pain. I meant that when using my cell phone, I try to hold my phone as loosely as possible in my left hand to reduce strain. My objective is maintaining an open hand as much as possible because a bent wrist and fingers curled in a grip to hold an object cause me to experience [CTS] symptoms and place me at risk of dropping my phone.
>
> The ALJ also asked me if I text with my fingers, and I told him that I do text. <u>He did not ask me how often I text or what precautions I take to reduce strain while texting</u>. If I had been asked about frequency, I would have testified that I don't text frequently and/or repetitively. When there's a need to text, I seek a hard surface to lay down my phone or switch to my iPad resting on my lap or a hard surface. I make a conscious effort to text with an open hand and my wrist in a straight position, not bent, and keep my fingers uncurled as much as possible[.]
>
> In the ALJ's decision denying my claim, he makes several references to gardening, including that I reported doing a "significant amount" of flower gardening. At the 6/8/22 hearing the ALJ asked if I do any gardening activities. I told him that I have planted flowers in

21

previous years because it helps with my depression and anxiety. The [ALJ] did not ask me to elaborate on my gardening activities.

I do not use lawn/garden equipment which has a motor, such as a weed eater, as both carrying it around and the vibration would hurt my hands. When "planting" flowers, mostly throwing out seeds/tubers, my husband loosens with ground (when necessary), e.g., tills, so digging isn't a necessity. My husband and kids help with any "planting." If there's a need for ongoing watering, my husband takes care of this with drip tape. My husband lays down landscape fabric and/or cardboard to minimize weeds. Whenever there are items weighing over about 10 [pounds] that need to be hauled around, my husband or another family member does the lifting/carrying.

When I have sporadically engaged in light gardening over the past few years, I have done so cautiously and taken frequent rest breaks for my hands. Even while gardening in a light and limited capacity to avoid aggravating my [CTS], I've experienced bilateral hand pain.

For my part, my objective is following my healthcare providers' recommendation in taking frequent breaks, about 20-30 minutes breaks for each hour of activity, limiting the number of consecutive hours, activities on successive days, etc. I know from experience that overdoing, particularly if I attempt gardening on successive days, I'm likely to experience a CTS flare that may require several days of resting my hands.

The ALJ also references the consultative examiner's finding that I have normal bilateral dexterity both large and small objects. Dr. [Tony W.] Canupp, the [consultative medical] examiner, did not test my ability to handle or make use of either large or small objects during the examination nor did he perform a pinch test.

After receiving the [ALJ]'s decision stating that I could lift and carry up to 50 pounds occasionally, I tried lifting a 50-pound bag of dirt. I could not do it without hurting myself, let alone repetitively. I avoid lifting and carrying more than about 10 pounds because it strains my hands and wrists. In recent years, I've also dropped and broken many lightweight objects (under 10 pounds) while attempting to lift and carry those objects around.

22

> In short, I am unable to perform repetitive movement with
> hands and fingers without significant pain and
> dysfunction, including sleep dysfunction. (I sometimes
> wake up during the night to "shake out" my numbed hands.)
> Therefore, I avoid activities requiring significant use
> of my hands and fingers. I have difficulty grasping and
> holding objects of any size without my hands and fingers
> becoming numb and painful. If I use my hands too much,
> e.g., pulling weeds as I described at the hearing, I need
> to rest my hands for days. I cannot lift and carry more
> than 10 pounds without straining my hand and wrists and
> risk hurting myself or dropping the object.

(Docket Entry 7-1 at 3-4 (emphasis added).) Plaintiff's Declaration would not render the ALJ's decision unsupported by substantial evidence for the following three reasons.

First, and most significantly, the ALJ acknowledged Plaintiff's testimony that she "experienc[ed] . . . wrist pain (worse on the right)" and "that she wore a right wrist brace most days and that she wore a left brace only about once per month" (Tr. 23 (referencing Tr. 69-71)), but the ALJ found that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of her symptoms [we]re not fully consistent with the evidence of record through the date last insured" (Tr. 28). The ALJ supported that analysis with substantial evidence by providing the following analysis:

> During Dr. Canupp's January 2021 consultative all systems
> exam, objective findings were generally unremarkable
> other than some decreased range of motion of fingers on
> the right hand, but notably, [Plaintiff] demonstrated
> normal bilateral dexterity for both large and small
> objects. . . . Tinel's and Phalen's signs were positive,
> but at the same time, [she] demonstrated full range of
> motion of all fingers and full (5/5) grip strength
> bilaterally. [She] testified that she could use her

23

fingers adequately for texting, which involved fine motor functioning. [Anti-nuclear antibody] labs were mildly positive in late 2021, but when seen by a rheumatologist in 2022, exam findings were normal other than a single tender joint in the right hand, and updated labs "all looked good" with no strong evidence of a systemic autoimmune disease. Primary care findings continued to be essentially stable.

. . .

Further, . . . [Plaintiff] testified during the hearing that she could drive a car, use a microwave, and perform basic household tasks, such as dusting, vacuuming, sweeping, mopping, doing laundry, and washing dishes with a dishwasher.

(Tr. 28-29.)[9]

Moreover, Plaintiff has not challenged that analysis beyond arguing, in her second assignment of error, that the ALJ mischaracterized Plaintiff's ability to garden and text (see Docket Entry 7 at 9-13; see also Docket Entry 12 at 3-4) and, for the reasons discussed in the context of Plaintiff's second issue on review, that argument lacks merit. Furthermore, Plaintiff's Declaration, like her hearing testimony and other record statements, lacks consistency with the record. She attempts to minimize her "gardening" activities by re-framing them as "mostly throwing out seeds/tubers" (Docket Entry 7-1 at 3), but Plaintiff's own, repeated statements to her treating psychologist Dr. Terry L. Ledford regarding her gardening activities (none of which describe those activities as merely throwing out seeds) (see Tr. 419

_____

[9] In addition, the ALJ found "generally persuasive" the opinions of the state agency medical consultants (Tr. 29), who each found that Plaintiff remained able to frequently handle and finger bilaterally (see Tr. 116, 124).

24

(10/19/17 "doing more outside work, and that helps"), 1216 (4/17/19 "working on the landscaping for her rental house, and that helps," "she makes spiritual connection when she is doing it"), 1205 (5/15/19 "doing the outside work in her yard and at her rental property," "talked about how healing gardening is for her"), 1197 (6/11/19 "growing flowers for [her daughter]'s wedding"), 1173 (8/8/19 "it has helped to work on . . . yard work"), 1217 (4/8/20 "trying to work in her yard to reduce her stress"), 1178 (7/29/20 "working with her plants to decrease her stress"), 1632 (3/10/21 "her gardening activities . . . help[ her] the most" to "decrease stress"), 1634 (4/21/21 "went about her . . . outside chores to deal with [the loss of her appeal in a lawsuit against her former employer]")), and her testimony at the hearing (see Tr. 84 ("there's nothing that helps [Plaintiff's mental symptoms] more than . . . hands in the dirt" (emphasis added)), 84-85 (in 2022, Plaintiff did "very minimal" gardening and "thr[ew] out a few tubers and some seeds," but in "previous years," Plaintiff had "garden[ed]" and "plant[ed] flowers" (emphasis added)), 98-99 (Plaintiff had "recent[ly]" pulled "invasive weed[s]" in her yard (emphasis added))) undermine her after-the-fact, self-serving Declaration statements. As the ALJ appropriately discounted Plaintiff's testimony and statements as inconsistent with the evidence, the Court simply has no basis to find that the ALJ would

25

have evaluated Plaintiff's Declaration statements more favorably to Plaintiff.

Second, Plaintiff's attempt to shift the blame to the ALJ for Plaintiff's own failure to qualify her ability to text and garden during the hearing misses the mark. (See Docket Entry 7-1 at 3 (faulting ALJ for not asking Plaintiff "how often [she] text[s] or what precautions [she] take[s] to reduce strain while texting" or "to elaborate on [her] gardening activities").) Although "the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record," Cook v. Heckler, 783 F.2d 1168, 1173–74 (4th Cir. 1986) (citations omitted), the ALJ "is not required to act as [a] claimant's counsel," and "is entitled to assume that a claimant represented by counsel is making her strongest case for benefits," Jason L. v. O'Malley, No. 3:23CV307, 2024 WL 1152405, at *11 (S.D.W. Va. Feb. 29, 2024) (unpublished) (internal quotation marks omitted), recommendation adopted, 2024 WL 1149282 (S.D.W. Va. Mar. 15, 2024) (unpublished).

Here, the record reflects that Plaintiff's hearing lasted nearly one and a half hours (see Tr. 47, 108), and that, during that time, the ALJ and Plaintiff's counsel discussed Plaintiff's ability to engage in activities (including texting and gardening) in significant detail (see Tr. 58-99). The ALJ did not prevent Plaintiff from fully answering the ALJ's questions regarding her

26

ability to use her cell phone and to garden. (See Tr. 84-85, 88, 98-99.) Moreover, Plaintiff and her husband each completed Function Reports on which they both indicated that Plaintiff texts and gardens/grows flowers, but did not place any physical limitations on her ability to text or limit her gardening ability to throwing out seeds. (See Tr. 291, 307.) Thus, Plaintiff had ample opportunity while her claim remained pending before the ALJ to accurately describe any limitations on her abilities to text and garden and cannot now assign blame to the ALJ for Plaintiff's own failure to do so.

Third, Plaintiff's criticism of the ALJ's reliance on Dr. Canupp's findings regarding Plaintiff's normal grip/pinch strength and hand dexterity, because, according to Plaintiff, Dr. Canupp "did not test [her] ability to handle or make use of either large or small objects during the examination nor did he perform a pinch test" similarly falls short. (Docket Entry 7-1 at 4 (referencing Tr. 24-25, 28 (in turn referencing Tr. 1413)).) Dr. Canupp conducted his examination of Plaintiff on January 30, 2021 (see Tr. 1410), and SSA records reflect that the record contained the examination by no later than February 15, 2021, when the state agency medical consultant at the initial level of review evaluated Dr. Canupp's findings as part of the consultant's analysis (see Tr. 111, 114-15). In the intervening nearly 16-month period between the initial denial of Plaintiff's claim (based, in part, on Dr.

27

Canupp's findings) and Plaintiff's hearing before the ALJ, Plaintiff did not raise in any of her appeal documents her concern that Dr. Canupp did not actually test Plaintiff's grip strength or manual dexterity (see Tr. 141 (request for reconsideration), 147-49 (request for hearing), 869-79 (Disability Report - Appeal), 886-896 (Disability Report - Appeal)). Even more significantly, at the hearing, the ALJ indicated that he planned to admit Exhibits 1A through 32F into the record (including Dr. Canupp's report at Exhibit 9F) (see Tr. 48-49), and Plaintiff's counsel represented that Plaintiff had no objection to any of the evidence (see Tr. 48), and did not mention any concerns regarding the accuracy of Dr. Canupp's findings during her opening statement (see Tr. 49-52). Plaintiff also did not raise any issues regarding the veracity of Dr. Canupp's report with the ALJ during the hearing. (See Tr. 52-99.) Under such circumstances, Plaintiff's after-the-fact denial that Dr. Canupp tested Plaintiff's grip/pinch strength or dexterity would not have rendered the ALJ's decision unsupported by substantial evidence.

In short, although the Appeals Council procedurally erred by failing to evaluate Plaintiff's Declaration and by failing to include it in the administrative transcript before the Court, those errors qualify as harmless under the circumstances of this case.

## 2. Plaintiff's Abilities to Text and Garden

Next, Plaintiff contends that "[t]he ALJ erred in relying on mischaracterizations of [Plaintiff's] activities in finding that she ha[d] an RFC for medium work." (Docket Entry 7 at 9 (bold font, block formatting, and initial capitals omitted); see also Docket Entry 12 at 3-4.) More specifically, Plaintiff asserts that "the ALJ relied on [Plaintiff's] limited ability to text and garden as evidence that she can perform medium-level lifting and carrying along with frequent handling and fingering," and, in so doing, "both mischaracterized the evidence and failed to explain how even [the ALJ's] distorted version of [Plaintiff's] activity level support[ed the ALJ's] RFC findings." (Docket Entry 7 at 9-10; see also id. at 10-11 (citing examples of how "[g]ardening and texting figured prominently in the ALJ's rejection of [Plaintiff's] claims that she had limited capacity for lifting, carrying, handling, and fingering" (citing Tr. 26-33)).) In Plaintiff's view, "the ALJ failed to point to any evidence in the record that [Plaintiff] engaged in anything more than intermittent light gardening, which she did as a mode of mental health therapy" (id. at 11), and "no evidence [existed] in the record that [Plaintiff] texts in any way that would approximate listing [sic] and carrying 20-50 pounds throughout the workday or frequent handling or fingering" (id. at 12). Plaintiff additionally notes that, although "[t]he ALJ concluded that this evidence '[wa]s inconsistent with an inability

29

to lift even 10 pounds or an inability to use [Plaintiff's] hand/fingers more than occasionally,'" (id. at 11 (quoting Tr. 31)), the ALJ "nonetheless failed to explain how it constitute[d] substantial evidence supporting his conclusion that [Plaintiff wa]s capable of lifting and carrying 20 pounds frequently and up to 50 pounds occasionally" (id.). Plaintiff's arguments fail to warrant remand for two reasons.

First, Plaintiff has not shown that the ALJ mischaracterized or overstated Plaintiff's abilities to text and garden. Regarding Plaintiff's ability to text, although the ALJ did not expressly discuss Plaintiff's testimony that texting with her "hands open [wa]s the . . . best thing for [her] to do" (Tr. 88), the Function Reports completed by Plaintiff and her husband placed no physical limitation on her ability to text (see Tr. 291, 307), and the ALJ, charged with the duty of resolving such conflicts in the evidence, see Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996) ("The duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court."), did not err by opting to credit Plaintiff's (and her husband's) statements reflecting a greater ability to text, see Footman v. Kijakazi, No. 21-1116, 2023 WL 1794156, at *2 (4th Cir. Feb. 7, 2023) (unpublished) (holding that ALJ need not "list[] every single additional qualifying statement about the extent to which [the plaintiff] can perform daily activities, [as long as] the ALJ [] demonstrate[s] that she adequately considered

30

them and found them to be inconsistent with specific, objective evidence in the record"); O'Neil v. Astrue, No. 8:07CV1074, 2008 WL 1930584 at *3 (M.D. Fla. Apr. 30, 2008) (unpublished) ("[T]he ALJ's paraphrasing [of the plaintiff's testimony regarding daily activities] is close to [the p]laintiff's actual testimony. . . . The mere fact that the ALJ declined to quote [the p]laintiff directly does not render [the ALJ's] opinion deficient.").

Concerning Plaintiff's gardening activities, none of her repeated statements to treating psychologist Dr. Ledford describe those activities as "light gardening" or merely throwing out seeds. (See Tr. 419 (10/19/17 "doing more outside work, and that helps"), 1216 (4/17/19 "working on the landscaping for her rental house, and that helps," "she makes spiritual connection when she is doing it"), 1205 (5/15/19 "doing the outside work in her yard and at her rental property," "talked about how healing gardening is for her"), 1197 (6/11/19 "growing flowers for [her daughter]'s wedding"), 1173 (8/8/19 "it has helped to work on . . . yard work"), 1217 (4/8/20 "trying to work in her yard to reduce her stress"), 1178 (7/29/20 "working with her plants to decrease her stress"), 1632 (3/10/21 "her gardening activities . . . help[ her] the most" to "decrease stress"), 1634 (4/21/21 "went about her . . . outside chores to deal with [the loss of her appeal in a lawsuit against her former employer]").) Moreover, the Function Reports completed by

Plaintiff and her husband did not limit Plaintiff's gardening ability to mere seed throwing (see Tr. 291, 307), and Plaintiff's testimony similarly fails to limit her gardening to only light activities or seed throwing (see Tr. 84 ("there's nothing that helps [Plaintiff's mental symptoms] more than . . . hands in the dirt" (emphasis added)), 84-85 (in 2022, Plaintiff did "very minimal" gardening and "thr[ew] out a few tubers and some seeds," but in "previous years," Plaintiff had "garden[ed]" and "plant[ed] flowers" (emphasis added)), 98-99 (Plaintiff had "recent[ly]" pulled "invasive weed[s]" in her yard (emphasis added))).

Plaintiff's argument faulting ALJ for finding Plaintiff's texting and gardening abilities "'inconsistent with an inability to lift even 10 pounds or an inability to use [Plaintiff's] hand/fingers more than occasionally,'" (Docket Entry 7 at 11 (quoting Tr. 31)), but "fail[ing] to explain how [such abilities] constitute[d] substantial evidence supporting [the ALJ's] conclusion that [Plaintiff wa]s capable of lifting and carrying 20 pounds frequently and up to 50 pounds occasionally" (id.) glosses over the relevant context of the ALJ's statement. The ALJ found Plaintiff's texting and gardening activities inconsistent with the opinions of Plaintiff's treating providers Nicki Vogel, FNP-BC ("FNP Vogel"), and Dr. Bond that Plaintiff "could lift/carry a maximum of less than 10 pounds whether frequently or occasionally." (Tr. 30; see also id. (deeming those opinions "disproportionate to

32

the overall record" (referencing Tr. 1672, 1675)), 31 (finding those opinions "generally unpersuasive" (referencing Tr. 1672, 1675)).) The ALJ thereafter expressly noted that "there [we]re no repeated objective findings inconsistent with an ability to lift/carry up to 50 pounds occasionally and 20 pounds frequently" (Tr. 30 (emphasis added)), and then provided the following analysis supporting that observation:

> It appears [FNP] Vogel and Dr. Bond at least partially – if not entirely – opined that such significant exertional restrictions were present due to [Plaintiff]'s hand issues stemming from [CTS]. However, relevant range of motion deficits were modest and inconsistent, [Plaintiff] was repeatedly found to have full (5/5) grip strength bilaterally, and Dr. Canupp found [Plaintiff] to have normal bilateral dexterity for both large and small objects. Recently, Dr. Bond himself found [Plaintiff] to have positive Tinel's and Phalen's signs, but also to have normal range of motion of all fingers, full (5/5) grip strength bilaterally, and contemporaneous right hand radiographs were unremarkable. Less than two weeks later, a rheumatologist examined 28 joints individually: there was one tender joint in the right hand, while the other 27 joints were normal. Also, [Plaintiff] has reportedly done a relatively significant amount of flower gardening during the period at issue, and she testified that she retained the ability to use her finger[s], e.g. for sending text messages, a fine motor activity.

(Tr. 30-31 (emphasis added).) The ALJ additionally found "generally persuasive" the state agency medical consultants' opinions that Plaintiff remained able to perform medium work with frequent bilateral handling and fingering. (Tr. 29 (referencing Tr. 115-16, 124).) Thus, as the language emphasized above shows, the ALJ specifically explained how the record evidence supported his finding that Plaintiff remained able to perform medium work,

33

and relied on much more than Plaintiff's abilities to text and garden in that discussion.[10]

In sum, Plaintiff's second issue on review fails as a matter of law.

### 3. RFC

Lastly, Plaintiff argues that "[t]he ALJ's RFC assessment is flawed and not supported by substantial evidence." (Docket Entry 7 at 13 (bold font, block formatting, and initial capitals omitted); see also Docket Entry 12 at 3-6.) In particular, Plaintiff maintains that the ALJ erred by failing to include in the RFC 1) greater limitations on Plaintiff's ability to lift, carry, handle, and finger (see Docket Entry 7 at 13-17), 2) the need for unscheduled bathroom breaks throughout the workday (see id. at 17-20), and 3) the mental limitations assessed by Plaintiff's treating psychologist Dr. Ledford (see id. at 20-22). For the reasons that follow, Plaintiff's contentions on all three fronts fail to provide a basis for remand.

a.  <u>Limitations on Lifting, Carrying, Handling, and Fingering</u>

With regards to the RFC's limitations on lifting, carrying, handling, and fingering, Plaintiff faults the ALJ for 1) "relying

---

[10] To the extent Plaintiff relies on her Declaration's descriptions of her abilities to text and garden to support her argument that the ALJ mischaracterized those abilities (see Docket Entry 7 at 11-13; see also Docket Entry 12 at 4), that argument fails because the record did not contain Plaintiff's Declaration at the time the ALJ issued his decision. Moreover, as discussed above, Plaintiff has not shown any basis for the Court to find that the ALJ would have evaluated Plaintiff's Declaration statements more favorably than the ALJ evaluated Plaintiff's testimony and other record statements.

34

on the RFC opinions of the [s]tate [a]gency [medical consultants] who were apparently unaware that [Plaintiff] had CTS and thus did not assess its impact on [the] RFC" (id. at 13-14 (citing Tr. 113, 121)), and 2) finding "'unpersuasive'" (id. at 16 (quoting Tr. 30)) the opinions of Dr. Bond and FNP Vogel that Plaintiff could lift and carry less than 10 pounds and only occasionally/rarely handle and finger (id. at 15 (citing Tr. 1672-78)), and "citing exam findings of normal grip strength and normal range of motion" (id. at 16), when Dr. Bond opined in the Bond Letter that "'findings of normal range of motion of the fingers, normal dexterity, normal grip strength, and normal radiographs ha[d] no bearing on the severity of [CTS] nor on the degree of impairment caused by [CTS]'" (id. at 16-17 (quoting Tr. 13) (emphasis omitted)).[11]

The ALJ did not err by finding "generally persuasive" (Tr. 29) the opinions of state agency medical consultants that Plaintiff could perform medium work with frequent handling and fingering (see Tr. 115-16, 124). As the Commissioner points out, the state agency medical consultants' opinions "understandably did not list [CTS] as an impairment because Plaintiff did not identify it as one of her disabling conditions when she applied for benefits." (Docket Entry 10 at 17 n.3 (citing Tr. 274); see also Tr. 274 (Disability Report

---

[11] Plaintiff argues that the ALJ erred by discounting Plaintiff's subjective symptom reports regarding the impact of her CTS on her ability to lift, carry, handle, and finger (see Docket Entry 7 at 14-15); however, as discussed above in the analysis of Plaintiff's first and second issues on review, the ALJ did not err in analyzing Plaintiff's subjective symptom reporting and supported that analysis with substantial evidence.

35

listing PTSD, interstitial cystitis, gastritis, hypertension, palpitations, depression, and anxiety as disabling impairments, i.e., <u>no hand impairment at all</u>).)  More significantly, the consultants considered Plaintiff's subjective reports of hand limitations as well as examination findings relating to her hands in assessing Plaintiff's RFC (<u>see</u> Tr. 111-12, 121, 125) and specifically included a limitation to frequent bilateral handling and fingering "due to reduced function" in Plaintiff's hands (Tr. 116, 124).  Thus, Plaintiff has not shown how the consultants' failure to mention CTS by name in their analysis prejudiced her in any way.

Plaintiff's contention that the ALJ erred in discounting the lifting, carrying, handling, and fingering opinions of Dr. Bond and FNP Vogel (<u>see</u> Docket Entry 7 at 15-17) fares no better.  As quoted above in the context of Plaintiff's second assignment of error, the ALJ expressly acknowledged Dr. Bond's finding of "positive Tinel's and Phalen's signs" (Tr. 31), but found "generally unpersuasive" the opinions of Dr. Bond and FNP Vogel (<u>id.</u>), citing "modest and inconsistent" reductions in Plaintiff's hand range of motion (Tr. 30), full grip strength bilaterally (<u>id.</u>), Dr. Canupp's findings of "normal bilateral dexterity for both large and small objects" (Tr. 30-31), "unremarkable" right hand x-rays (Tr. 31), a rheumatologist finding of one tender joint out of 28 joints examined (<u>id.</u>), and Plaintiff's abilities to text and garden (<u>id.</u>).

36

Moreover, Plaintiff's reliance on the Bond Letter to challenge the ALJ's reliance on the above-described objective evidence falls short. As noted above in the discussion of Plaintiff's first assignment of error, Plaintiff submitted the Bond Letter to the Appeals Council to rebut the ALJ's reliance on Plaintiff's normal hand range of motion, dexterity, and strength (see Tr. 13, 1013-23), but the Appeals Council found that the Bond Letter "d[id] not show a reasonable probability that it would change the outcome of the [ALJ's] decision" (Tr. 2). Accordingly, the Court "must review the record as a whole, including [the Bond Letter], in order to determine whether substantial evidence supports the [Commissioner]'s findings." Wilkins, 953 F.2d at 96. For the reasons that follow, the Court should find that the Bond Letter does not render the ALJ's decision unsupported by substantial evidence.

The Bond Letter provides, in pertinent part, as follows:

To Whom It May Concern:

I evaluated [Plaintiff] on February 23, 2022. At that time, she complained of pain, numbness, tingling, and swelling in her hands since 2014. She had had previous nerve studies confirming a diagnosis of [CTS]. At that time, I confirmed the clinical diagnosis of [CTS] of bilateral hands and we discussed treatment options.

I have been made aware of an [ALJ]'s assessment of [Plaintiff's] functional capacity in degree of impairment. I would like to clarify/elaborate on some of the statements made by the [ALJ] in his decision.

• The findings of <u>normal range of motion of the fingers, normal dexterity, normal grip</u>

37

> strength, and normal radiographs have no
> bearing on the severity of [CTS] nor on the
> degree of impairment caused by [CTS.]
>
> • [CTS] causes pain and limitation of function
>   with certain physical tasks including
>   repetitive use, gripping and grasping, and
>   heavy lifting. The degree of symptoms and
>   impairment vary from patient to patient[.]
>
> • Both my 2/23/33 [sic] and 5/30/22 assessments
>   and [Plaintiff's] complaints of inability to
>   perform prolonged or repetitive handling and
>   fingering are fully consistent with the CTS
>   diagnosis and prior exam findings as well as
>   the 2016 [electromyogram ('EMG')].

I hope this adds some clarification to this case.

(Tr. 13 (emphasis added).) The Bond Letter would not have adversely affected the substantiality of the evidence supporting the ALJ's decision because the Bond Letter contains internal inconsistencies and also conflicts with the contemporaneously submitted Declaration of Plaintiff.

The Bond Letter proclaims in the first bulleted subparagraph that normal dexterity and grip strength "have no bearing on the severity of [CTS] nor on the degree of impairment caused by [CTS]" (id.), and then, in the very next subparagraph, states that "[CTS] causes . . . limitation of function with . . . gripping and grasping" (id. (emphasis added)). Dr. Bond did not explain why, if CTS causes limited ability to grip and grasp, findings of normal grip strength and dexterity would hold no relevance to Plaintiff's

38

degree of impairment from CTS.  (See id.)[12]  Further, the Bond Letter's proclamation that normal grip strength and dexterity have no bearing on the level of functional impairment from CTS conflicts with Plaintiff's statements in her Declaration that "a bent wrist and fingers curled in a grip to hold an object . . . place[d her] at risk of dropping [her] phone" (Docket Entry 7-1 at 3 (emphasis added)), that she "dropped and broke[] many lightweight objects (under 10 pounds) while attempting to lift and carry th[o]se objects around" (id. at 4 (emphasis added)), that she "ha[d] difficulty grasping and holding objects of any size without [her] hands and fingers becoming numb and painful" (id. (emphasis added)), and that she "c[ould] not lift and carry more than 10 pounds without . . . risk[ing] . . . dropping the object" (id. (emphasis added)).  Plaintiff cannot have it both ways, by contending that her CTS results in difficulty grasping and holding objects, and then attacking the ALJ for relying on repeated findings of normal grip strength and dexterity.

b.  Need for Unscheduled Bathroom Breaks

Next, Plaintiff challenges the ALJ's failure to include the need for unscheduled bathroom breaks in the RFC.  (See Docket Entry 7 at 17-20; see also Docket Entry 12 at 6.)  In that regard, Plaintiff contends that the ALJ 1) "made no reference to [Social

---

[12] Although normal hand x-rays might not hold relevance to the degree of impairment from CTS, the ALJ also found that Plaintiff suffered from severe inflammatory arthritis (see Tr. 21) and thus the ALJ did not err in relying on unremarkable x-rays of Plaintiff's right hand (see Tr. 31).

Case 1:23-cv-00388-CCE-LPA  Document 13  Filed 05/02/24  Page 39 of 59

Security Ruling 15-1p, <u>Titles II and XVI: Evaluating Cases Involving Interstitial Cystitis (IC)</u>, 2015 WL 1292257 (Mar. 18, 2015) ('SSR 15-1p')]" (Docket Entry 7 at 18), 2) "failed to cite any medical evidence regarding [Plaintiff's] IC treatment other than a brief reference to pelvic floor therapy in 2021" (<u>id.</u> (citing Tr. 25 (in turn citing Tr. 1415, 1547))) "and an uncited reference to 'primary care and urogynecology records through 2020'" (<u>id.</u> (quoting Tr. 28)), 3) over-relied on Dr. Canupp's "conclusory statement that [Plaintiff] ha[d] experienced 'rather marked improvement' of IC symptoms" (<u>id.</u> (quoting Tr. 25 (in turn quoting Tr. 1414))), and 4) "improperly rejected [FNP] Vogel's opinion [that Plaintiff needs at least eight bathroom breaks during a workday] based on lack of objective evidence" and "provide[d] no basis for [the ALJ's] interpretation that [FNP Vogel's opinion] . . . equates to 4 hours of breaks" (<u>id.</u> at 19 (referencing Tr. 31)). None of those grounds entitles Plaintiff to remand.

In addition to faulting the ALJ for "ma[king] no reference to SSR 15-1p" (<u>id.</u> at 18), Plaintiff contends that the ALJ also violated SSR 15-1p by failing to "consider[] 'longitudinal evidence because symptoms, signs, and laboratory findings of [IC] may fluctuate in frequency and severity'" (Docket Entry 12 at 6 (quoting SSR 15-1p, 2015 WL 1292257, at *5)) and instead "relied on mention of 'improvement' in symptoms without providing details

40

regarding how symptoms or limitations have improved" (id. (quoting Tr. 25)).

Although the ALJ here did not cite SSR 15-1p in his decision (see Tr. 21-34), as the Commissioner points out, "[a]n ALJ's failure to cite a Social Security Ruling does not constitute error, where, as here, the ALJ complied with the regulatory scheme" (Docket Entry 10 at 21 n.6 (citing Tisoit v. Barnhart, 127 F. App'x 572, 574 (3d Cir. 2005))). Contrary to Plaintiff's assertions, the ALJ did consider the longitudinal evidence of Plaintiff's IC treatment, noting that:

- "[t]he evidence of record prior to July 2016 document[ed] a history of treatment for [IC] with urinary frequency and mild incontinence" (Tr. 24);

- "urogynecology records through late 2019 document daily treatment with Uribel, which was noted to be helpful for management of chronic urinary symptoms" (id. (citing Tr. 1523-26 (reflecting no complaints of frequent daytime urination and reporting "occasion[al]" need to empty bladder overnight)));

- "[p]rimary care records through 2020 largely document intermittent findings consistent with allergy and sinus problems, as well as some recurrent urinary tract infections during certain periods" (id. (citing Tr. 1269-1325));

- at Dr. Canupp's January 2021 consultative examination, Plaintiff "reported a history of issues related to chronic [IC], but with current specialist treatment, her associated symptoms were 'for the most part now much improved'" (id. (quoting Tr. 1411)), and Dr. Canupp "concluded that [Plaintiff]'s main medical issue was chronic [IC], with 'rather marked improvement' of symptoms on current specialist treatment" (Tr. 25 (quoting Tr. 1414));

41

- "in 2021, [Plaintiff] participated in pelvic floor physical therapy, which was beneficial in regard to [her IC]/urinary symptoms" (id. (referencing Tr. 1436-69, 1547-68)); and

- "[u]rogynecology records through late March 2022 indicate that continued pelvic floor physical therapy had been 'quite helpful' and that [Plaintiff]'s symptoms had improved overall[, that s]he was only getting up once per night to empty her bladder, and bladder pain had diminished" (id. (quoting Tr. 1656)).

In light of the ALJ's IC-related findings spanning the entirety of the relevant period in this case, Plaintiff has simply not shown that the ALJ failed to comply with the requirements of SSR 15-1p in his evaluation of Plaintiff's IC. Those findings also defeat Plaintiff's assertion that the ALJ "failed to cite any medical evidence regarding [Plaintiff's] IC treatment other than a brief reference to pelvic floor therapy in 2021" (Docket Entry 7 at 18 (citing Tr. 25 (in turn citing Tr. 1415, 1547))) "and an uncited reference to 'primary care and urogynecology records through 2020'" (id. (quoting Tr. 28)).

Plaintiff additionally challenges the ALJ's over-reliance on Dr. Canupp's "conclusory statement that [Plaintiff] ha[d] experienced 'rather marked improvement' of IC symptoms" (id. (quoting Tr. 25 (in turn quoting Tr. 1414))), because Dr. Canupp neither "offered [] medical support from his own examination, nor . . . cite[d] any of [Plaintiff's] extensive IC treatment history[,]" and his "statement is too vague to be meaningful in an RFC determination[, because i]t provides no vocationally relevant

42

information about the critical symptom that would interfere with persisting at tasks in a workplace for 2-hour periods: urinary frequency" and "offered no context and no timeframe of the improvement" (id. at 18-19).

As an initial matter, the observations by the ALJ bulleted above make clear that he relied on much more than Dr. Canupp's statements about Plaintiff's IC improvements in assessing the limiting effects of her IC symptoms. Moreover, the ALJ expressly acknowledged that Dr. Canupp "did not provide a function-by-function opinion as to [Plaintiff]'s overall functional abilities/limitations" (Tr. 25), and, thus, considered Dr. Canupp's statements not as objective findings but as reflections of Plaintiff's subjective reports to Dr. Canupp regarding significant improvement in her IC symptoms (see Tr. 1411 ("[Plaintiff's] major issues to me today seemed to be related to chronic [IC] for which she has tried various treatments and is seeing a urogynecologist now to try to get the symptoms under control, and she says that they are for the most part now much improved." (emphasis added))).

Plaintiff additionally maintains that the ALJ "improperly rejected [FNP] Vogel's opinion [that Plaintiff needs at least eight bathroom breaks during a workday] based on lack of objective evidence" (Docket Entry 7 at 19 (referencing Tr. 31)), in contravention of Social Security Ruling 16-3p, Titles II and XVI Evaluation of Symptoms in Disability Claims, 2017 WL 5180304 (Oct.

43

25, 2017) ("SSR 16-3p") and "Fourth Circuit caselaw" (id. (citing Lewis v. Berryhill, 858 F.3d 858 (4th Cir. 2017))). Plaintiff further notes that the ALJ "failed to explain what objective evidence beyond Plaintiff's count he would expect to be available to prove urinary frequency." (Docket Entry 12 at 6.)

Plaintiff's argument that the ALJ violated SSR 16-3p and/or Lewis by considering the lack of objective evidence supporting FNP Vogel's opinion regarding Plaintiff's need for bathroom breaks fails for two reasons. First, as a general matter, those authorities do not prohibit the ALJ from relying on objective evidence as one part of the analysis of the intensity, persistence, and limiting effects of Plaintiff's IC symptoms, see SSR 16-3p, 2017 WL 5180304, at *5 ("[An ALJ] will not disregard a[ claimant]'s statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the [claimant]. A report of minimal or negative findings or inconsistencies in the objective medical evidence is one of the many factors [an ALJ] must consider in evaluating the intensity, persistence, and limiting effects of a[ claimant]'s symptoms." (emphasis added) (footnote omitted); see also Lewis, 858 F.3d at 866 ("[The plaintiff's] subjective evidence of pain intensity cannot be discounted solely based on objective medical findings." (emphasis added)). Here, beyond the objective medical evidence,

44

the ALJ considered Plaintiff's subjective statements to her treatment providers regarding improvement in her symptoms (see Tr. 24-25, 28), her significant daily activities (see Tr.), and the opinion evidence (see Tr. 29-34). That approach sufficed under the law. See Sanchez v. Kijakazi, No. 1:21CV907, 2023 WL 4743018, at *10 (E.D. Cal. July 25, 2023) (unpublished) ("As to [the p]laintiff's subjective complaints regarding his bathroom use, the [c]ourt finds that the ALJ provided specific, clear and convincing reasons to discount those complaints. . . . [T]he ALJ found [the p]laintiff's allegations unsupported by the objective record. Although lack of supporting medical evidence cannot form the sole basis for discounting testimony, it is a factor that the ALJ can consider. Here, for example, the ALJ cited record evidence that [the p]laintiff reported ongoing improvement . . . ." (emphasis added)), recommendation adopted, 2023 WL 5817583 (E.D. Cal. Sept. 7, 2023) (unpublished).

Second, and more significantly, in the specific context of evaluating the persuasiveness of medical opinions, the regulations require the ALJ to determine the "supportability" of such opinions, which involves consideration of the degree to which "a medical source" offers "objective medical evidence and supporting explanations . . . to support his or her medical opinion(s)," 20 C.F.R. § 404.1520c(c)(1) (emphasis added). Here, FNP Vogel opined that Plaintiff needed "8 [] or more" bathroom breaks "per day" of

45

"20-30 minutes each" in duration, and provided the supporting explanation that "[Plaintiff] states she uses the bathroom 8-16 times per day due to IC. [Plaintiff] consumes frequent water to help with IC symptoms - thus causing frequent bathroom breaks." (Tr. 1677 (emphasis added).) FNP Vogel's explanation thus makes abundantly clear that she based her opinion about Plaintiff's need for bathroom breaks entirely on Plaintiff's own subjective statements. (See id.) Accordingly, the ALJ did not err by noting the lack of "objective medical evidence to suggest that [Plaintiff] would require up to 4 hours' worth of breaks during an 8-hour workday for purposes of urination due to frequent water consumption" (Tr. 31). See Ramirez v. Astrue, 373 F. App'x 709, 711 (9th Cir. 2010) ("Because [the physician]'s statement that [the plaintiff] required up to fifteen bathroom breaks a day derived primarily from [the plaintiff]'s discredited subjective complaints, the ALJ also properly discredited [the physician]'s statement."); Carr v. Commissioner of Soc. Sec. Admin., No. 5:16CV2247, 2017 WL 2797434, at *8 (N.D. Ohio June 28, 2017) (unpublished) ("[T]he need for additional bathroom breaks [wa]s based primarily on [the plaintiff]'s subjective complaints, which the ALJ did not find convincing.").[13]

---

[13] Plaintiff complains that the ALJ "provide[d] no basis for his interpretation that [FNP Vogel's bathroom breaks opinion] . . . equates to 4 hours of breaks." (Docket Entry 7 at 19 (referencing Tr. 31).) The ALJ, however, did not mischaracterize FNP Vogel's extreme opinion. FNP Vogel opined that Plaintiff needed "8 [] or more" bathroom breaks "per day" of "20-30 minutes (continued...)

46

Furthermore, Plaintiff's suggestion that the ALJ "failed to explain what objective evidence beyond Plaintiff's count he would expect to be available to prove urinary frequency" (Docket Entry 12 at 6) misses the mark. The ALJ discussed Plaintiff's conservative treatment history for IC, which consisted of taking the medication Uribel (see Tr. 24) and attending pelvic floor physical therapy (see Tr. 25), both resulting in significant improvement (see Tr. 24, 25). Such objective evidence undermines FNP Vogel's opinion that Plaintiff required at least eight bathroom breaks during a workday (see Tr. 1677). See Ramirez, 373 F. App'x at 711 (noting that "[i]t may be true that the frequency of an individual's [impairment-related need to use the restroom] sometimes can be demonstrated only by that individual's subjective complaints," but further observing that "[the plaintiff]'s statements regarding the severity of his symptoms [we]re inconsistent with [his physician]'s treatment notes" which indicated that "[the plaintiff]'s symptoms had improved overall"); Smith v. Astrue, No. 2:11CV32, 2011 WL 7768882, at *8 (N.D.W. Va. Aug. 31, 2011) (unpublished) ("[The plaintiff] testified that she suffered from urinary frequency, causing her to need to use the restroom every fifteen to twenty minutes after her hysterectomy and diagnosis with [IC]. However, the ALJ noted that [the plaintiff] testified her symptoms improved

---

[13](...continued)
each" (Tr. 1677), and, thus, even assuming she needed only eight breaks, i.e., the lowest predicted number of breaks, if each break lasted 30 minutes, the total would equate to four hours as stated by the ALJ (see Tr. 31).

after beginning to take a medication called Elmiron, and the ALJ gave weight to this evidence."), recommendation adopted, 2012 WL 1435661 (N.D.W. Va. Apr. 24, 2012) (unpublished); Brady v. Commissioner of Soc. Sec., No. 1:12CV2175, 2013 WL 2456368, at *2 (N.D. Ohio June 6, 2013) (unpublished) ("[The plaintiff] contends that what requires reversal or remand, is the lack of a narrative discussion describing how the evidence supports the ALJ's finding that [the p]laintiff will not require a bathroom break outside of regular breaks during the workday.  However, in so arguing, [the p]laintiff ignores that the ALJ thoroughly analyzed this precise issue, noting that the [plaintiff]'s medical treatment record with [] many physicians include[d] sufficient evidence that her prescribed treatment significantly improve[d] her functioning and help[ed] control her symptoms far beyond the extent of her allegations." (internal quotation marks omitted)); compare Vaughn v. Commissioner of Soc. Sec., No. 3:15CV2151, 2017 WL 1179953, at *8 (D. Or. Mar. 29, 2017) (unpublished) (finding error in "ALJ's determination that [the plaintiff]'s testimony [regarding her need for unscheduled bathroom breaks wa]s not supported by the objective medical evidence," where "[t]he record . . . indicate[d] considerable treatment [for IC], including five surgical

48

procedures and twice monthly monitoring of a fentanyl patch and opioids").[14]

c. <u>Dr. Ledford's Mental Limitations</u>

Lastly, Plaintiff argues that the ALJ erred by failing to adopt the work-preclusive mental limitations offered by Dr. Ledford ("Ledford MSS"). (<u>See</u> Docket Entry 7 at 20-22 (referencing Tr. 1690-1702).)[15] In particular, Plaintiff faults the ALJ for basing his decision to discount the Ledford MSS on Plaintiff's "'fluctuating but ongoing activities,'" and the ALJ's "conclusory statement" that, "'[i]n light of the foregoing evidence and related considerations, the [ALJ] finds that Dr. Ledford's opinion statements are unpersuasive because they are inconsistent with the broader evidentiary record and with portions of his own longitudinal treatment records.'" (<u>Id.</u> at 21 (quoting Tr. 33).)

_____

[14] In Plaintiff's reply, she faults the ALJ for "fail[ing] to include any discussion of the interference that [Plaintiff's] medical appointments, including weekly psychotherapy and pelvic floor physical therapy, would pose for [her] ability to maintain regular employment." (Docket Entry 12 at 5.) Plaintiff did not, however, raise that issue in her principal brief (<u>see</u> Docket Entry 7), and the Court will not consider issues raised for the first time in a reply brief, <u>see</u> <u>Hunt v. Nuth</u>, 57 F.3d 1327, 1338 (4th Cir. 1995) (explaining that "courts generally will not address new arguments raised in a reply brief because it would be unfair to the [other party] and would risk an improvident or ill-advised opinion on the legal issues raised"); <u>Thompkins v. Key Health Med. Sols., Inc.</u>, No. 1:12CV613, 2015 WL 1292228, at *7 (M.D.N.C. Mar. 23, 2015) (unpublished) (Peake, M.J.) ("The ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered." (internal quotation marks omitted)), <u>recommendation adopted</u>, 2015 WL 3902340 (M.D.N.C. June 24, 2015) (unpublished) (Beaty, S.J.).

[15] Although the ALJ evaluated the persuasiveness of "three opinion-related documents from Dr. Ledford" (Tr. 32; <u>see also</u> Tr. 32-33 (referencing April 2017 Copeland Symptoms Checklist for Adult Attention Deficit Disorders (Tr. 1680-81), June 2018 letter in support of Plaintiff's litigation against her former employer (Tr. 1682-83), and June 2022 Ledford MSS (Tr. 1690-1702))), Plaintiff challenges only the ALJ's evaluation of the Ledford MSS (<u>see</u> Docket Entry 7 at 20-22).

49

In Plaintiff's view, the Ledford MSS "is well-supported" (id.) and "consistent with [consultative psychological examiner Dr. Michael F. Fiore's] exam, which the ALJ found persuasive" (id. at 22 (citing Tr. 32 (in turn citing Tr. 1400))).

Dr. Ledford signed the Ledford MSS on June 1, 2022 (see Tr. 1693), and opined that Plaintiff's mental impairments would cause her to remain off-task for more than 15 percent of the workday (see Tr. 1691), prevent her from "accept[ing] instructions and respond[ing] appropriately to criticism from supervisors without excessive irritability, sensitivity, argumentativeness, or suspiciousness" and from "deal[ing] appropriately with the ordinary stresses of regular work activity" (Tr. 1692), and would cause her to miss work "[m]ore than two days per month" (Tr. 1693). In a narrative explanation accompanying the MSS, Dr. Ledford explained that he had treated Plaintiff since December 17, 2015 (see Tr. 1694), and that he had diagnosed Plaintiff with PTSD (see Tr. 1695) arising out of "workplace bullying" (Tr. 1696) that had culminated in a "surprise termination" on June 30, 2016 (Tr. 1695). Dr. Ledford noted that, during their one-hour sessions, Plaintiff "often exhibit[ed] restlessness, significant distractibility, and difficulty maintaining concentration," as well as that, "[a]s her anxiety increase[d], her face often flushe[d] as her speech bec[ame] more rapid and she drift[ed] on and off topic." (Tr. 1698.) Dr. Ledford further opined that Plaintiff experienced

50

"extreme[]" limitations in her abilities to "relate to a supervisor and some co-workers" (Tr. 1697), "sustain an ordinary routine, a consistent and reliable work pace, and regular attendance at work" (Tr. 1698), and "deal with normal work activity and the stress inherent in work situations" (Tr. 1700).

The ALJ evaluated the Ledford MSS as follows:

> While not indicative of significant underlying cognitive issues, [the Ledford MSS] . . . can reasonably be interpreted to otherwise reflect essentially pervasive and debilitating functional deficits in regard to social functioning, concentration/persistence/pace, and adaptive functioning. This view is inconsistent with the record as a whole. Despite some symptomatic exacerbations, Dr. Ledford's own records also document [Plaintiff]'s fluctuating but ongoing activities like gardening, managing her Airbnb property (including cleaning, bill management, and other such tasks), occasionally spending time with friends (e.g., dining out, getting their nails done, etc.), participating at times in a large Bible study group, spending time with her children when possible, traveling at times, and spending beneficial time at her mountain home. Moreover, Dr. Fiore's objective evaluation findings included some abnormalities, but none of marked severity. Dr. Canupp noted that [Plaintiff] was "a bit" anxious, but she was also fully oriented and in no acute distress. Further, basic mental status findings from other providers were typically unremarkable, e.g., normal mood and affect, normal speech, full orientation, and/or appropriate insight and judgment. In light of the foregoing evidence and related considerations, the [ALJ] finds that [the Ledford MSS is] unpersuasive because [it is] inconsistent with the broader evidentiary record and with portions of his own longitudinal treatment records.

(Tr. 33.) Plaintiff challenges that analysis on two grounds, neither of which carry the day.

First, Plaintiff contends that the ALJ "failed to provide any analysis of [the Ledford MSS] as required by 20 [C.F.R.

51

§] 404.1520c" (Docket Entry 7 at 20) beyond "cit[ing Plaintiff's] 'fluctuating but ongoing activities,'" and then "failed to explain how [those activities] undermine[d the Ledford MSS]" (id. at 21). According to Plaintiff, she "had minimal responsibility for a family home that she occasionally rented out through VRBO in 2021 and 2022," and, "[w]hen she did have renters, her husband and son assisted with turnovers." (Id. (citing Tr. 65, 256).) Plaintiff further notes that her "[B]ible study was only once per week, and her attendance was sporadic" (id. (citing Tr. 84, 295, 303)), as well as "that, for the most part, she avoid[ed] social contact outside of her immediate family" (id. (citing Tr. 91)).

As an initial matter, the ALJ's above-quoted analysis shows that, contrary to Plaintiff's assertions, the ALJ did provide an analysis of the Ledford MSS which involved more than relying on Plaintiff's "fluctuating but ongoing activities." (Tr. 33.) The ALJ additionally noted that the Ledford MSS conflicted with the mental findings of Dr. Fiore, Dr. Canupp, and Plaintiff's other providers, as well as with "portions of [Dr. Ledford's] own longitudinal treatment records." (Id.)

Moreover, the ALJ did not mischaracterize or over-rely on Plaintiff's abilities to manage an Airbnb rental property, attend Bible study, and socialize with others. Although Plaintiff points to her own testimony and statements she and her husband submitted in support of her DIB claim regarding such activities which she

52

claims demonstrate restrictions on her ability to perform those activities (see Docket Entry 7 at 21 (citing Tr. 65, 84, 91, 256, 295, 303), the record contained many other descriptions of those activities showing a greater ability to manage her rental property (see Tr. 447 (worked on rental house), 448 (very busy with rental house), 528 (fixed several things at mountain house), 555 (rented the family home), 1135 (preparing for incoming renters), 1173 (working on rental house and yardwork), 1197 (continued work on rental with husband), 1216-17 (worked on landscaping at rental), 1220 (worked on rental with husband), 1228 (worked with family on getting rental ready), 1248 (put rental on Airbnb), 1626 (worked all day on rental), 1640-41 (reporting physical work on rental), 1642 (traveled to rental to clean it up between renters), 1650 (worked on rental for incoming renters)), attend Bible study (see Tr. 419 (attended Bible study), 452 (attended church), 552 (attended Bible study), 1214 (Bible study helped "tremendously")), and socialize (see Tr. 419 (attended neighbor's block party), 421 (attended family wedding), 429 (attended couple of social events), 447 (went out with friends), 554 (went out to eat twice and got nails done with a friend), 555 (had dinner with two other couples), 1089 (went out to eat with friends more than once), 1140 (attended daughter's wedding which went well), 1147 (went to dinner for friend's birthday), 1178 (attended family events), 1201 (attended family events), 1203 (spent time with son and his friends), 1205

53

(attended daughter's college graduation), 1210 (went to Lake Lure for dinner), 1225 (attended wedding and baby shower), 1230 (celebrated husband's birthday with kids and volunteered at credit counseling center), 1235 (drove to visit ailing friend and went wedding dress shopping with daughter), 1240 (went out to eat twice), 1640 (attended family gathering at lake), 1642 (attended two weddings), 1651 (celebrated husband's birthday with kids)). The ALJ must resolve such conflicts in the evidence, see Smith, 99 F.3d at 638 ("The duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court."), and did not err by opting to credit Plaintiff's statements to Dr. Ledford and other providers reflecting a greater ability to manage her Airbnb rental property, attend Bible study, and socialize with others, see Footman, 2023 WL 1794156, at *2 (holding that ALJ need not "list[] every single additional qualifying statement about the extent to which [the plaintiff] can perform daily activities, [as long as] the ALJ [] demonstrate[s] that she adequately considered them and found them to be inconsistent with specific, objective evidence in the record").[16]

---

[16] Notably, the record contains evidence that Plaintiff performed a wide array of other activities such as wreath making (see Tr. 1155, 1248), handling family matters (see Tr. 410-11 (assisted mother-in-law with removing father-in-law's possessions and readying house for sale), 413 (attended meeting at sister's group home as her guardian), 417 (cleaned out basement), 518 (moved daughter into dorm), 533-34 (helped mother-in-law with paperwork for brother-in-law's trust), 542 (spent weekend taking care of father-in-law), 543 (worked on taxes), 550 (cleaned out closet), 558 (helped husband prepare for job interview), 559 (took care of father-in-law in Burlington), 1118 (worked with group home team to help sister), 1173 (worked on daughter's wedding), 1210 ("very busy" with work on tax
(continued...)

Second, Plaintiff contends that, contrary to the ALJ's finding that the Ledford MSS lacked consistency "with the broader evidentiary record and with portions of his own longitudinal treatment records" (Tr. 33), the Ledford MSS "is well-supported" (Docket Entry 7 at 21) and "consistent with [Dr. Fiore's] exam, which the ALJ found persuasive" (id. at 22 (citing Tr. 32 (in turn citing Tr. 1400))). In support of that argument, Plaintiff points out that the Ledford MSS "described clinical findings during [Plaintiff's] sessions consistent with severe limitations in concentration: restlessness, significant distractibility, and difficulty maintaining concentration." (Id. at 21-22 (referencing Tr. 1698).) Plaintiff further comments that the Ledford MSS harmonizes with Dr. Fiore's findings that Plaintiff displayed "rapid, over-inclusive, and rambling speech as well as depressed and anxious mood[,] . . . that [she] became increasingly distractible, with 'loosened thinking,' as the interview progressed[,] . . . [that s]he exhibited considerable difficulty maintaining concentration on serial 7s and mental

---

[16](...continued)
audit), 1633 (cared for sister and brother-in-law)), and traveling (see Tr. 402 (traveled "a lot" for husband's job interviews), 404 (took vacation in Glacier National Park), 426 (traveled for Christmas), 525 (attended family reunion in Louisville, Kentucky), 1121 (leaving next day for Disney vacation), 1123 (took trip to see daughter), 1129 (went to Kentucky for funeral and going to Los Angeles for Thanksgiving), 1189 & 1194 (had good visit with daughter in Los Angeles), 1436 (traveled "a lot"), 1559 (traveled)). That evidence further supports the ALJ's finding that Plaintiff's "fluctuating but ongoing activities" conflicted with the "extreme[] limit[ations]" on the Ledford MSS (Tr. 33; see also Tr. 26-27 (ALJ's in-depth discussion of Plaintiff's activities reported in Dr. Ledford's treatment notes)).

calculations[,] . . . that [her] reduced attention span would impair her ability to perform repetitive tasks on a sustained basis[,] . . . [and] that [she] has limited stress tolerance that would interfere with even a low stress work routine." (Id. (citing and quoting Tr. 1400).)

As Plaintiff notes (see id. at 21-22 (referencing Tr. 1698)), the Ledford MSS reports that, "[w]hen discussing stressors during one-hour psychotherapy sessions, [Plaintiff] often exhibit[ed] restlessness, significant distractibility, and difficulty maintaining concentration," as well as that, "[a]s her anxiety increase[d], her face often flushe[d] as her speech bec[ame] more rapid and she drift[ed] on and off topic" (Tr. 1698). The ALJ, however, found the Ledford MSS "inconsistent with . . . portions of [Dr. Ledford's] own longitudinal treatment records" (Tr. 33 (emphasis added)), which the ALJ noted "reflect[ed] numerous indications of [Plaintiff]'s efforts to alleviate her symptoms and focus productively on other endeavors" (Tr. 26), "note[d] daily use of stress reduction techniques" (Tr. 27), and, "during nearly all of her visits, [] indicated that [her] prognosis was good" (id.). Indeed, although a few of Dr. Ledford's treatment notes in the immediate aftermath of Plaintiff's June 2016 termination document "[a]nxious" mood (Tr. 509-16, 518-21, 668-73), those treatment notes consistently reflect Dr. Ledford's observations that Plaintiff arrived on-time with appropriate dress and grooming, and

56

descriptions of Plaintiff as fully oriented, cognitively intact, open, cooperative, responsive, and engaged (see Tr. 402-30, 443-52, 509-59, 1038-40, 1118-1256). Moreover, Plaintiff often reported her symptoms as "improved" (Tr. 404, 422, 424-25, 429, 451, 523, 531, 533, 537, 539, 542-43, 554-55, 559, 1039, 1140, 1144, 1189, 1197, 1201, 1205, 1220, 1224, 1230, 1243, 1250, 1641; but see Tr. 450, 1171, 1242, 1634, 1627 (reporting symptoms as "worse")), and Dr. Ledford nearly always rated Plaintiff's prognosis as "good" (Tr. 445, 1118-1256, 1626-43, 1645-55; but see Tr. 443, 1644 (rating prognosis as "fair")).

Contrary to Plaintiff's contentions (see Docket Entry 7 at 22), the "extreme[] limit[ations]" on the Ledford MSS (Tr. 1697-98, 1700-01) do not harmonize with Dr. Fiore's findings and opinions (see Tr. 1401-05). Although Dr. Fiore described Plaintiff's speech as "well-articulated, but rapid and a bit over-inclusive and rambling" and her thinking as "increasingly loose and distractible as the interview progressed" (Tr. 1403), while also finding her concentration "[i]mpaired" (Tr. 1404), Dr. Fiore nevertheless opined that Plaintiff could "understand, retain, and follow simple work-related instructions" (Tr. 1405), that her reduced "attention span would moderately interfere with her ability to perform repetitive tasks on a sustained basis" (id. (emphasis added)), that she would have "moderate problems relating to fellow workers and supervisors" (id. (emphasis added)), and that, in "a low stress

57

work routine," her limited "tolerance for emotional stress . . . would <u>moderately</u> interfere with her work performance" (<u>id.</u> (emphasis added)). The ALJ found Dr. Fiore's opinions "generally persuasive" (Tr. 32) and, consistent with that finding, found Plaintiff's mental impairments caused "<u>moderate</u>" limitations in her abilities to interact with others, concentrate, persist, or maintain pace, and adapt or self-manage (Tr. 22 (emphasis added)), and included corresponding limitations in the RFC to "simple instructions [] not at a production-rate pace" (Tr. 22), "simple work-related decisions" (<u>id.</u>), "no more than occasional changes in the routine work setting" (Tr. 23), and "no more than occasional interaction with the public, coworkers, and supervisors" (<u>id.</u>). As the ALJ expressly recognized, "Dr. Fiore's objective evaluation findings included some abnormalities, but none of marked severity" (Tr. 33), let alone <u>extreme</u> severity.

Put simply, Plaintiff's third and final assignment of error does not establish a basis for remand.

### III. CONCLUSION

Plaintiff has not established an error warranting relief.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be **AFFIRMED,** and that this action be **DISMISSED** with prejudice.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

May 2, 2024